FILED

2019 NOV 21  PM 3:59

CLERK US DISTRICT COURT
CENTRAL DIST OF
LOS ANGELES

BY:

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

October 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>LESLIE ANDRE EZIDORE,<br>     aka "Andre" and<br>     "Dre,"<br>MARCUS ORLANDO ARMSTRONG,<br>SANDY MAI TRANG NGUYEN, and<br>ALEXANDER MICHAEL SEMENIK,<br><br>          Defendants. | No. SA CR 19CR00195-5▷5<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1347(a)(2): Health<br>Care Fraud; 42 U.S.C. § 1320a-<br>7b(b): Illegal Remunerations in<br>Connection with Federal Health<br>Care Programs; 18 U.S.C. § 1341:<br>Mail Fraud; 18 U.S.C. § 1516(a):<br>Obstructing a Federal Audit; 18<br>U.S.C. §§ 981 and 982 and 28<br>U.S.C. § 2461(c): Criminal<br>Forfeiture] |

///
///
///
///
///
///

MA:ma

The Grand Jury charges:

COUNTS ONE THROUGH TWENTY-ONE

[18 U.S.C. §§ 1347(a)(2), 2]

[Defendants EZIDORE, ARMSTRONG, and NGUYEN]

At times relevant to this Indictment:

A.   INTRODUCTORY ALLEGATIONS

Defendants, Related Entities, and Others

1.   Defendant LESLIE ANDRE EZIDORE, also known as ("aka")
"Andre" and "Dre," was a resident of Los Angeles, California.
Defendant EZIDORE was the beneficial owner of purported business
entities including Epistemic Research Group, Inc. and Sumanu
Holdings, Inc., and an owner and operator of Infinite Health
Solutions, Inc. ("IHSI"), doing business as ("dba") Irvine Wellness
Pharmacy, located at 113 Waterworks Way, Suite 215, Irvine,
California ("Irvine Wellness").

2.   Defendant MARCUS ORLANDO ARMSTRONG was a resident of Los
Angeles, California.  Defendant ARMSTRONG was the owner of a
purported business entity known as Catalyst Research LLC and an owner
and operator of Irvine Wellness.

3.   Defendant SANDY MAI TRANG NGUYEN was a resident of Irvine,
California.  Defendant NGUYEN was a pharmacist licensed by the State
of California and a pharmacist-in-charge of Irvine Wellness.

4.   Defendant ALEXANDER MICHAEL SEMENIK was a resident of
Henderson, Nevada.  Defendant SEMENIK owned and operated a purported
business entity known as Optimization LLC through which defendant
SEMENIK received and paid commissions for the referral of
prescriptions to Irvine Wellness.

5.   "Pharmacist 1" was a licensed California pharmacist and the former owner and operator of Irvine Wellness.

6.   "Pharmacy Tech 1" was a licensed California pharmacy technician at Irvine Wellness Pharmacy from in or about September 2014 to in or about June 2016.  California law authorized Pharmacy Tech 1 to perform packaging, manipulative, repetitive, and other nondiscretionary tasks while assisting, and while under the direct supervision and control of, a pharmacist.

7.   "Physician 1" was a licensed California physician engaged in the practice of plastic and reconstructive surgery.  Physician 1 solely owned "LLC 1," a purported entity established by defendant ARMSTRONG to conceal payments that defendants EZIDORE and ARMSTRONG caused to be made to Physician 1 in exchange for authorizing certain compounded drug prescriptions.

Compounded Drugs

8.   In general, "compounding" was a practice by which a licensed pharmacist combined, mixed, or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.  Compounded drugs were not approved by the U.S. Food and Drug Administration ("FDA"), that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.  The California Board of Pharmacy regulated the practice of compounding in the State of California.

9.   Compounded drugs were not typically prescribed and were available when an FDA-approved drug did not meet the health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved drug, such as a dye or a preservative, a compounded drug could be prepared excluding the

substance that triggered the allergic reaction.  Compounded drugs were available when a patient could not consume a drug by traditional means, such as an elderly patient or a child who could not swallow an FDA-approved pill and needed the drug in a liquid form that was not otherwise available.

TRICARE

10.   TRICARE was a health care benefit program, as defined by 18 U.S.C. § 24(b), and a federal health care program, as defined by 42 U.S.C. § 1320a-7b(f)(1), that provided health care benefits, items, and services to Department of Defense beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

11.   The Defense Health Agency ("DHA"), an agency of the United States Department of Defense, was responsible for overseeing the TRICARE program.  Express Scripts, Inc. ("ESI") was a pharmacy benefit manager that administered TRICARE's prescription drug benefits.  Claims for reimbursement for services rendered or goods provided, including covered compounded drug prescriptions, were submitted to ESI for payment by TRICARE.

12.   TRICARE provided health care benefits for certain prescription drugs, including certain compounded drugs, that were medically necessary and prescribed pursuant to TRICARE rules and regulations.  In order to become a pharmacy entitled to submit claims for reimbursement to the TRICARE program, a pharmacy was required to execute a "PSAO Pharmacy Affiliation Authorization" under which the pharmacy agreed to comply with all applicable state and federal laws including, among other things, that no claims for reimbursement would be submitted to TRICARE for filling a prescription absent proof that

the prescription followed a face-to-face examination by a physician and that the fulfilling pharmacy would collect a copayment from the beneficiary at the time of dispensing a prescription.

13.  During the calendar years of 2013-2015, inclusive, the period of time during which defendants EZIDORE, ARMSTRONG, and NGUYEN, and others known and unknown to the Grand Jury, operated Irvine Wellness, Irvine Wellness had the following TRICARE claims activity, substantially all of which was for filling prescriptions for compounded drugs:

| CALENDAR YEAR | NUMBER OF CLAIMS | AMOUNT CLAIMED | AMOUNT PAID | AVG PMT/CLAIM |
|---|---|---|---|---|
| 2013 | 0 | 0 | 0 | 0 |
| 2014 | 163 | $1,254,978 | $1,077,478 | $6,610 |
| 2015 | 994 | $13,687,621 | $11,290,595 | $11,359 |

Regulatory Agencies

14.  The California Board of Pharmacy ("CBOP") was a regulatory agency responsible for the licensing of pharmacies, pharmacists, and pharmacy technicians in the State of California.  CBOP was authorized by law and pursuant to the terms of issuance of pharmacy licenses to inspect pharmacies to ensure their compliance with applicable laws, rules, and regulations.  Pursuant to California law, no person, corporation, or limited liability company was authorized to conduct a pharmacy in the State of California without first obtaining a license from CBOP.  California law required written notice to be sent to CBOP within 30 days of any transfer of 10 percent or more of the beneficial interest in a business entity licensed by CBOP to a person or entity who did not hold a beneficial interest at the time CBOP originally issued the permit.

15.  The United States Drug Enforcement Agency ("DEA") was a federal agency authorized to issue certifications ("DEA

Certification") to pharmacies to dispense medications identified as controlled substances under 21 U.S.C. § 812.  A pharmacy could not lawfully dispense controlled substances unless it had a properly-issued and current DEA Certification.  A DEA Certification was not transferable upon a pharmacy's change of ownership, control, location, or business activity.

Irvine Wellness's Creation and Financial Trouble

16.  On or about March 15, 2012, Pharmacist 1 signed and submitted to CBOP a "Community Pharmacy Permit Application" for a license for IHSI to operate a new pharmacy under the name of Payless Pharmacy IV at 113 Waterworks Way, Suite 160A, Irvine, California. Pharmacist 1 identified himself on that application as IHSI's sole shareholder, Chief Executive Officer, President, Secretary, and Treasurer.  Pharmacist 1 informed CBOP that he intended to operate Payless Pharmacy IV as a walk-in, retail pharmacy and expected that Payless Pharmacy IV would fill few, if any, prescriptions for compounded drugs.

17.  On or about June 8, 2012, CBOP issued pharmacy operating license number PHY 50976 ("PHY 50976") to IHSI, dba Payless Pharmacy IV, pursuant to the application signed and submitted by Pharmacist 1.

18.  PHY 50976 required annual renewal, on or before June 1 of each calendar year after issuance, and further required that each renewal be certified under penalty of perjury by the licensee pharmacy's "owner, if an individual ownership; a partner, if a partnership; or corporate officer, if a corporation[.]"

19.  On or about November 1, 2012, Pharmacist 1 caused to be filed in Orange County, California, a Fictitious Business Name Statement to change the fictitious or operating name of Payless

Pharmacy IV to Irvine Wellness.  On or about January 15, 2013, Pharmacist 1 signed and submitted to CBOP a request to change PHY 50976 to reflect that name change.

20.  By in or about July 2013, Irvine Wellness became unprofitable and was, in fact, losing approximately $10,000 a month, because it did not have sufficient walk-in, retail traffic and had no other significant sources of revenue.   Pharmacist 1 retained a business broker to list Irvine Wellness for sale.

B.   THE FRAUDULENT SCHEME

21.  Beginning on or about a date unknown, but no later than in or about July 2013, and continuing to in or about July 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants EZIDORE, ARMSTRONG, and NGUYEN, together with others known and unknown to the Grand Jury, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice to obtain money from health care benefit programs, namely, TRICARE, by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.   MANNER AND MEANS OF THE FRAUDULENT SCHEME

22.  The fraudulent scheme operated, in substance, in the following manner:

Fraudulent Acquisition and Concealment of Irvine Wellness

a.   Defendants EZIDORE and ARMSTRONG, and others known and unknown to the Grand Jury, would take the following steps, among others, to fraudulently acquire and conceal their acquisition of Irvine Wellness from regulatory authorities:

7

i.   On or about July 14, 2013, defendant EZIDORE falsely used the name of Nominee 1 as the purported buyer in a "Letter of Intent Stock Transfer Purchase" (the "Letter of Intent") that conveyed an offer to purchase 100% of the stock of IHSI in order to use Irvine Wellness for "compounding and distribution of pain medications."  Defendant EZIDORE identified Nominee 1 as the purported buyer because defendant EZIDORE knew that his felony criminal history would prevent him from being able to buy and obtain a license to operate Irvine Wellness.

ii.   On or about August 1, 2013, after escrow had just opened, defendant EZIDORE and Pharmacist 1 agreed that Pharmacist 1 would remove his personal effects and property from Irvine Wellness and would turn over possession and control of Irvine Wellness to defendants EZIDORE and ARMSTRONG without alerting regulatory authorities to the change of possession and control of Irvine Wellness.

iii.   On or about August 14, 2013, defendant EZIDORE, through Nominee 1, entered into an "Agreement for Purchase and Sale of Stock" (the "Sale Agreement") to buy Irvine Wellness.

iv.   In or about August 2013, defendant EZIDORE partially paid for stock of IHSI through funds from an account in the name of Sumanu Holdings LLC, an entity held in the name of Nominee 1 but that defendant EZIDORE solely controlled.

v.   On or about September 27, 2013, defendant EZIDORE caused Nominee 1 to sign a California Secretary of State's "Statement of Information" that stated that Nominee 1 was the Chief Executive Officer, Secretary, Chief Financial Officer, sole director, and agent

1   for service of process of IHSI, when, in fact, Nominee 1 had no

2   actual or beneficial ownership or control of IHSI.

3               vi.   On or about November 18, 2013, defendant EZIDORE

4   directed Nominee 1 to sign an "AccessHealth Pharmacy Provider

5   Participation Enrollment Form" that was submitted to Irvine

6   Wellness's pharmacy benefit manager that falsely represented that

7   Nominee 1 was the owner of Irvine Wellness and that there had been no

8   ownership changes at Irvine Wellness in the 18 months prior to

9   November 18, 2013.

10              vii.   On or about November 18, 2013, defendant

11  EZIDORE directed Nominee 1 to sign a "PSAO Pharmacy Affiliation

12  Authorization" to permit Irvine Wellness to submit claims for

13  reimbursement to TRICARE.   That authorization falsely represented

14  that Nominee 1 was the owner of Irvine Wellness.   By signing the

15  form, Nominee 1 further represented that Irvine Wellness would comply

16  with the ESI Provider Manual that stated, among other things, that

17  prescriptions would not be reimbursed absent a genuine physician's

18  examination and that Irvine Wellness was required to collect

19  copayments from TRICARE beneficiaries at the time that covered

20  prescriptions were dispensed.

21              viii.   Defendant EZIDORE, Pharmacist 1, and others

22  known and unknown to the Grand Jury agreed that Pharmacist 1 would

23  annually renew PHY 50976, and that they would not notify CBOP of the

24  transfer of Irvine Wellness, in violation of CBOP rules that required

25  that notice of transfer of a pharmacy be promptly given after such

26  transfer.   Defendant EZIDORE, Pharmacist 1, and others known and

27  unknown to the Grand Jury similarly agreed to renew the DEA

28  Certification for Irvine Wellness, and that they would not notify the

1   DEA about the transfer of Irvine Wellness, in violation of DEA rules
2   that required that notice of transfer of a pharmacy be promptly given
3   after such transfer.

4           ix.    Defendants EZIDORE and ARMSTRONG, and Pharmacist
5   1 agreed that Pharmacist 1 would continue to hold himself out as the
6   owner of Irvine Wellness in the event of regulatory inspections,
7   audits, or other inquiries that might reveal the transfer or change
8   of ownership of Irvine Wellness and, thereby, jeopardize its
9   continued operation under the control of defendant EZIDORE and others
10  known and unknown to the Grand Jury.

11          x.    On or about November 1, 2013, in order to qualify
12  for an assignment of the building premises lease for Irvine Wellness,
13  defendant EZIDORE emailed the leasing agent for the owner of the
14  premises for Irvine Wellness an attachment that defendant EZIDORE
15  identified as his "2012 Fed Tax Return" for calendar year 2012 that
16  had purportedly been signed and prepared by an associate of Tax
17  Accounting Firm 1, on behalf of defendant EZIDORE.  In fact, no one
18  associated with Tax Accounting Firm 1 had prepared such return.

19          xi.    On or about November 1, 2013, in order to
20  qualify for an assignment of the building premises lease for Irvine
21  Wellness, defendant EZIDORE completed and signed, as "CEO" of IHSI, a
22  "Lease Application" in which, among other things, defendant EZIDORE
23  stated that he was the sole officer of IHSI and falsely stated that
24  no "officers, partners, or owners [of IHSI had] ever been delinquent
25  in payment of any financial obligation . . . ."  In fact, defendant
26  EZIDORE had previously filed for bankruptcy, including in 2010.
27  Defendant EZIDORE also filed a declaration under oath in June 2008
28  that all of his "debt obligations," including "loans, credit cards,

and lines of credit" were "[a]ll on average of six months late or so."

    xii. On or about November 6, 2013, in order to qualify for an assignment of the building premises lease for Irvine Wellness, defendant EZIDORE emailed the leasing agent for the owner of the premises for Irvine Wellness an attachment, "2013_11-06_16_17_08.pdf," which defendant EZIDORE identified as his calendar year 2011 federal income tax return that had purportedly been signed and prepared by an associate of Tax Accounting Firm 1, on behalf of defendant EZIDORE.  In fact, no one associated with Tax Accounting Firm 1 had prepared such return.

  <u>Fraudulent Acts to Maintain Secret Control of Irvine Wellness</u>

    b. In furtherance of the scheme to fraudulently acquire and conceal the acquisition of Irvine Wellness from regulatory authorities, defendants EZIDORE, ARMSTRONG, and NGUYEN, and others known and unknown to the Grand Jury, committed the following acts, among others:

    i. On or about April 10, 2014, defendant EZIDORE, defendant NGUYEN, Pharmacist 1, and others known and unknown to the Grand Jury, agreed to submit, and caused to be submitted to CBOP, the annual renewal for PHY 50976, for the period of on or about June 1, 2014, to and including on or about May 31, 2015, signed by defendant NGUYEN and by Pharmacist 1, that falsely stated that Pharmacist 1 was the owner of Irvine Wellness.

    ii. On or about January 13, 2015, defendants EZIDORE and NGUYEN caused Pharmacist 1 to sign a CBOP pharmacist-in-charge change form that falsely stated that Pharmacist 1 was the owner of Irvine Wellness.

iii.   On or about March 24, 2015, defendants EZIDORE
and NGUYEN, Pharmacist 1, and others known and unknown to the Grand
Jury, agreed to submit, and caused to be submitted to CBOP the annual
renewal for PHY 50976, for the period of approximately June 1, 2015
to May 31, 2016, signed by defendant NGUYEN and bearing the purported
signature of Pharmacist 1, which falsely stated that Pharmacist 1 was
the owner of Irvine Wellness.

Disguising Kickbacks for Compounded Drug Prescription Referrals

c.   Defendants EZIDORE and ARMSTRONG, Pharmacy Tech 1, and
others known and unknown to the Grand Jury prepared and instructed
marketers, including defendant SEMENIK and others known and unknown
to the Grand Jury, to complete documents, including IRS Forms W-2, W-
4, and W-9, that purported to show that Irvine Wellness had employed
or "onboarded" marketers as salaried employees.  Defendants EZIDORE
and ARMSTRONG, and others known and unknown to the Grand Jury,
fraudulently used such documents to conceal illegal kickback payments
to marketers by making it appear that their compensation was a salary
when, in fact, it was based on the volume of referrals and net
TRICARE reimbursements generated by such marketers.

d.   Defendants EZIDORE and ARMSTRONG, and others known and
unknown to the Grand Jury, caused the creation of limited liability
corporations and shell entities, and paid kickbacks to marketers
through shell entities, in order to disguise and conceal the payment
of kickbacks.  Such entities included Epistemic Research Group, Inc.,
a purported entity whose business address was a post office box in
Beverly Hills and whose purported owner and operator was defendant
EZIDORE's ex-girlfriend, and Catalyst Research, a purported entity
owned and controlled by defendant ARMSTRONG.  Defendants EZIDORE and

ARMSTRONG described kickback payments from such entities to marketers as compensation for "marketing research" when, in fact, no marketing or research had been conducted or sought.

Fraudulent Claims

e.   Defendant NGUYEN and others known and unknown to the Grand Jury used, and directed employees of Irvine Wellness to accept, compounded drug prescription forms, that were distributed to marketers for the purpose of filling compounded drug prescriptions. The forms identified multiple compounded drug formulations, purportedly to treat pain, stretch marks, migraines, and wounds, and to promote general wellness, that defendant NGUYEN and others known and unknown to the Grand Jury included on the forms because they provided the maximum possible TRICARE reimbursements rather than because they addressed legitimate, individual patient needs and were medically necessary.

f.   Defendant NGUYEN provided suggested language to physicians for "prior authorization 'key words'" for compounded drug prescriptions to ensure reimbursement claims appeared legitimate, even where no actual physician-patient relationship existed.

g.   Defendant ARMSTRONG and others known and unknown to the Grand Jury obtained personal identifying information for TRICARE beneficiaries so they could use this information to have prescriptions prepared for compounded medications on behalf of these beneficiaries.  Defendants ARMSTRONG and NGUYEN, and others known and unknown to the Grand Jury, thereafter prepared and caused to be prepared prescriptions for compounded medications on behalf of such beneficiaries by using the name and other personal identifying

information of Physician 1 without Physician 1's knowledge or consent.

h.   Defendants ARMSTRONG and NGUYEN, and others known and unknown to the Grand Jury, created and sent, and caused to be created and sent, fraudulent documents to Physician 1 that purported to be for a "Five-month Physician Study," and directed Physician 1 to keep such documents on hand in order to falsely represent to regulatory agencies, federal health care programs, and insurers that payments made to Physician 1 were consideration for professional services for running a "study" when, in fact, such payments were illegal kickbacks and no study existed.

i.   Defendant ARMSTRONG, Pharmacy Tech 1, and others known and unknown to the Grand Jury created prescription spreadsheets that purported to identify patient examinations that, in fact, had not occurred, and compounded drug prescription forms that purported to show that Physician 1 had authorized the prescriptions when, in fact, Physician 1 had not done so.  Defendant ARMSTRONG, and others known and unknown to the Grand Jury, directed Physician 1 to use the false spreadsheets and prescriptions forms to create phony patient records in order to mislead regulators who were conducting an audit of TRICARE claims relating to Irvine Wellness.

j.   In order to conceal and disguise the payment of kickbacks to Physician 1 for authorizing compounded drug prescriptions, defendant ARMSTRONG caused the formation of LLC 1, and directed Physician 1 to open a JPMorgan Chase bank account in the name of LLC 1.  Defendant ARMSTRONG thereafter deposited kickbacks into this bank account.

k.   Defendant ARMSTRONG, and others known and unknown to the Grand Jury, paid and caused others, known and unknown to the Grand Jury, to pay kickbacks of several thousand dollars in cash to TRICARE beneficiaries, including Beneficiary 1 and Beneficiary 2, for agreeing to seek compounded drug prescriptions that were authorized by Physician 1.

l.   Defendant NGUYEN, and others known and unknown to the Grand Jury, filled and caused to be filled compounded drug prescriptions, and defendants EZIDORE, ARMSTRONG, and NGUYEN, and others known and unknown to the Grand Jury, caused fraudulent reimbursement claims for such prescriptions to be submitted to TRICARE knowing such claims were fraudulent because, among other things:

i.   Few, if any, of the prescriptions arose from a genuine physician-patient relationship, including because, as defined by TRICARE, they did not arise from an actual physical examination of the TRICARE beneficiary at all, by a qualified health care professional, or via a video-teleconference conducted over a pre-approved telecommunications link.

ii.   Substantially all of the prescriptions were faxed or electronically sent to Irvine Wellness from marketers to whom Irvine Wellness had agreed to pay illegal kickbacks disguised as employee compensation.

iii.   Substantially all of the prescriptions were identically or nearly identically described on the same or similar prescription form that identified pre-formulated compounds.

iv.   Few, if any, of the beneficiaries for whom the prescriptions were provided ever paid, nor did Irvine Wellness

attempt to collect, any copayment as required by TRICARE, with some of the required but unpaid copayments in amounts as high as thousands of dollars.

v.   Many of the prescriptions purportedly were written by the same group of prescribing physicians who were seldom located in the same states as the beneficiaries.

vi.   Irvine Wellness conducted little, if any, due diligence upon receipt of the prescriptions to verify whether, in fact, the beneficiaries actually sought the prescribed medications and deliberately refrained from calling beneficiaries in order to avoid giving notice to the beneficiaries that the prescriptions were being filled.

vii.   Many of the prescribed medications had little, if any, medical value as all were for generic pain, scarring, stretch marks, or erectile dysfunction, or were vitamins for "metabolic general wellness."

viii.   The compounded formulations were virtually identical for all of the beneficiaries regardless of their purported illnesses, and few, if any, of the prescriptions were specifically formulated based on the individualized needs, medical history, allergic reaction potential, contraindications, or conflicts with other prescription medications that were unique to each beneficiary.

ix.   Irvine Wellness had filled virtually no similar prescriptions in the period before defendants EZIDORE and ARMSTRONG became involved in the operation of Irvine Wellness.

x.   A substantial amount of Irvine Wellness's income came from reimbursements from TRICARE for the compounded medications prescriptions, and the amounts received on each prescription were far

16

higher than the amounts received from comparatively minimal walk-in business and other prescription activity.

D.   EXECUTIONS OF THE FRAUDULENT SCHEME

23.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants EZIDORE, ARMSTRONG, and NGUYEN, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and willfully executed and attempted to execute the fraudulent scheme described above, by submitting and causing to be submitted to TRICARE the following false and fraudulent claims:

| COUNT | DATE | CLAIM(S) |
|-------|------|----------|
| ONE | 12/19/14 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $18,749 for compounded drug prescription in the name of Beneficiary 3 |
| TWO | 12/23/14 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $18,749 for compounded drug prescription in the name of Beneficiary 4 |
| THREE | 1/5/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $18,931 for compounded drug prescription in the name of Beneficiary 2 |
| FOUR | 1/30/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $18,931 for compounded drug prescription in the name of Beneficiary 4 |
| FIVE | 3/9/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $19,930 for compounded drug prescription in the name of Beneficiary 5 |
| SIX | 3/9/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $19,930 for compounded drug prescription in the name of Beneficiary 6 |
| SEVEN | 3/11/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $19,930 for compounded drug prescription in the name of Beneficiary 7 |

| COUNT | DATE | CLAIM(S) |
|---|---|---|
| EIGHT | 3/12/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $19,930 for compounded drug prescription in the name of Beneficiary 8 |
| NINE | 3/18/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $19,930 for compounded drug prescription in the name of Beneficiary 9 |
| TEN | 4/16/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $20,536 for compounded drug prescription in the name of Beneficiary 10 |
| ELEVEN | 4/16/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $20,536 for compounded drug prescription in the name of Beneficiary 11 |
| TWELVE | 4/16/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $64,975 for compounded drug prescription in the name of Beneficiary 12 |
| THIRTEEN | 4/23/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $64,975 for compounded drug prescription in the name of Beneficiary 13 |
| FOURTEEN | 4/24/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $64,975 for compounded drug prescription in the name of Beneficiary 14 |
| FIFTEEN | 5/7/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $64,975 for compounded drug prescription in the name of Beneficiary 1 |
| SIXTEEN | 5/8/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $64,975 for compounded drug prescription in the name of Beneficiary 15 |
| SEVENTEEN | 5/9/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $64,975 for compounded drug prescription in the name of Beneficiary 16 |
| EIGHTEEN | 3/31/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $16,429 for compounded drug prescription in the name of Beneficiary 17 |

| COUNT | DATE | CLAIM(S) |
|---|---|---|
| NINETEEN | 3/31/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $18,931 for compounded drug prescription in the name of Beneficiary 17 |
| TWENTY | 3/31/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $18,931 for compounded drug prescription in the name of Beneficiary 18 |
| TWENTY-ONE | 3/31/15 | Claim submitted by Irvine Wellness to TRICARE in the approximate amount of $19,930 for compounded drug prescription in the name of Beneficiary 19 |

COUNTS TWENTY-TWO AND TWENTY-THREE

[18 U.S.C. §§ 1341, 2(b)]

[Defendants EZIDORE and NGUYEN]

24.   The Grand Jury realleges paragraphs 1 through 20 of this Indictment here.

A.   THE FRAUDULENT SCHEME

25.   Beginning on or about a date unknown to the Grand Jury, but at least as early as in or about July 2013, and continuing through at least on or about July 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants EZIDORE and NGUYEN, together with others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised, participated in, executed and attempted to execute a scheme and artifice to obtain money and property from TRICARE by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.   MANNER AND MEANS OF THE FRAUDULENT SCHEME

26.   The fraudulent scheme operated, in substance, by the means and in the manner alleged in paragraph 22 of this Indictment, the allegations of which the Grand Jury realleges here.

C.   USE OF THE MAIL

27.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California and elsewhere, defendants EZIDORE and NGUYEN, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the items below to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service, according to the directions thereon:

20

| COUNT | DATE | ITEM MAILED |
|---|---|---|
| TWENTY-TWO | 1/19/15 | Envelope containing Pharmacist-in-Charge change form and check number 1126, written on JPMorgan Chase account of Infinite Health Solutions, in the approximate amount of $100, with memo "PIC change" |
| TWENTY-THREE | 3/24/15 | Envelope containing 2015 PHY 50976 renewal application and check number 1155, written on JPMorgan Chase account of Infinite Health Solutions, in the approximate amount of $331, with memo "PHY 50976" |

COUNTS TWENTY-FOUR THROUGH FORTY-TWO

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

[Defendants EZIDORE, ARMSTRONG, and SEMENIK]

28.    The Grand Jury realleges paragraphs 1 through 20 of this Indictment here.

29.    On or about the dates set forth below, in Orange County, within the Central District of California, and elsewhere, the defendants identified below knowingly and willfully offered to pay, paid, and caused to be offered and paid remuneration to marketers, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Irvine Wellness for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| TWENTY-FOUR | 12/15/14 | ARMSTRONG | Check no. 1045 to entity R.M., with memo "Marketing," from Catalyst Research JPMorgan Chase account, and signed by defendant ARMSTRONG | $21,428 |
| TWENTY-FIVE | 2/6/15 | ARMSTRONG | Check no. 1107 to entity R.M., with memo "Marketing," from Catalyst Research JPMorgan Chase account and signed by defendant ARMSTRONG | $16,418 |
| TWENTY-SIX | 2/16/15 | ARMSTRONG | Check no. 1279 to entity R.M., with memo "Marketing," from Catalyst Research JPMorgan Chase account and signed by defendant ARMSTRONG | $10,000 |

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| TWENTY-SEVEN | 2/16/15 | EZIDORE | Check no. 1146 to defendant Pharmacy Tech 1 with memo "Market Research Comm," from Epistemic Research Group, Inc. JPMorgan Chase account and signed by defendant EZIDORE | $1,000 |
| TWENTY-EIGHT | 2/20/15 | EZIDORE | Check no. 1155 to entity J.E., with memo "Market Research Comm," from Epistemic Research Group, Inc. JPMorgan Chase account and signed by defendant EZIDORE | $25,717 |
| TWENTY-NINE | 3/16/15 | EZIDORE | Check no. 1170 to entity G.E.M.S., with memo "Market Research Comm," from Epistemic Research Group, Inc. JPMorgan Chase accountand signed by defendant EZIDORE | $28,136 |
| THIRTY | 5/5/15 | ARMSTRONG | Check no. 1124 to B.I. with memo "Marketing," from Catalyst Research JPMorgan Chase account and signed by defendant ARMSTRONG | $9,442 |
| THIRTY-ONE | 5/6/15 | EZIDORE | ACH electronic payment, reference number ending in 5016, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $20,094 |
| THIRTY-TWO | 5/7/15 | SEMENIK | Wire transfer, reference number ending in 0974, to Todd Schreier from Optimization LLC US Bank account | $6,700 |
| THIRTY-THREE | 5/15/15 | EZIDORE | Check no. 1244 to entity S.M. Corp., with memo "Market Research Comm," from Epistemic Research Group, Inc. JPMorgan Chase account, and signed by defendant EZIDORE | $8,524 |
| THIRTY-FOUR | 5/18/15 | ARMSTRONG | Check no. 1145 to B.I. with memo "Marketing," from Catalyst Research JPMorgan Chase accountand signed by defendant ARMSTRONG | $28,327 |

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| THIRTY-FIVE | 5/19/15 | EZIDORE | ACH electronic payment, reference number ending in 0797, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $20,000 |
| THIRTY-SIX | 5/20/15 | SEMENIK | Wire transfer, reference number ending in 1517, from Optimization LLC US Bank account to Todd Schreier | $1,150 |
| THIRTY-SEVEN | 6/1/15 | EZIDORE | ACH electronic payment, reference number ending in 3592, from Epistemic Research Group, Inc. JPMorgan Chase account to entity G.E.M.S., FBO G.G., aka G.L. | $24,901 |
| THIRTY-EIGHT | 6/2/15 | EZIDORE | ACH electronic payment, reference number ending in 7317, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $10,000 |
| THIRTY-NINE | 6/4/15 | EZIDORE | Wire transfer, reference number ending in 55ES, from Epistemic Research Group, Inc. JPMorgan Chase account to Finanstra LLC, FBO John Kosolcharoen, for "Marketing Research Comm" | $662,338 |
| FORTY | 6/5/15 | EZIDORE | ACH electronic payment, reference number ending in 2711, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $50,000 |
| FORTY-ONE | 6/17/15 | EZIDORE | ACH electronic payment, reference number ending in 4040, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $10,000 |
| FORTY-TWO | 8/5/15 | EZIDORE | Wire transfer, reference number ending in 1640, from Epistemic Research Group, Inc. Wells Fargo Bank account to Optimization LLC | $55,000 |

COUNTS FORTY-THREE THROUGH FORTY-EIGHT

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2(b)]

[Defendant SEMENIK]

30.   The Grand Jury realleges paragraphs 1 through 20 of this Indictment here.

31.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant SEMENIK knowingly and willfully solicited and received remuneration, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Irvine Wellness for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| COUNT | DATE | ITEM | APPROXIMATE AMOUNT |
|-------|------|------|--------------------|
| FORTY-THREE | 5/6/15 | ACH electronic payment, reference number ending in 5016, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $20,094 |
| FORTY-FOUR | 5/19/15 | ACH electronic payment, reference number ending in 0797, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $20,000 |
| FORTY-FIVE | 6/2/15 | ACH electronic payment, reference number ending in 7317, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $10,000 |
| FORTY-SIX | 6/5/15 | ACH electronic payment, reference number ending in 2711, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $50,000 |
| FORTY-SEVEN | 6/17/15 | ACH electronic payment, reference number ending in 4040, from Epistemic Research Group, Inc. JPMorgan Chase account to Optimization LLC | $10,000 |
| FORTY-EIGHT | 8/5/15 | Wire transfer, reference number ending in 1640, from Epistemic Research Group, Inc. Wells Fargo Bank account to Optimization LLC | $55,000 |

COUNT FORTY-NINE

[18 U.S.C. §§ 1516(a), 2]

[Defendants ARMSTRONG and NGUYEN]

32.   The Grand Jury realleges paragraphs 1 through 20 of this Indictment here.

33.   On or about January 29, 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants ARMSTRONG and NGUYEN, with the intent to deceive and defraud the United States, endeavored to influence, obstruct, and impede ESI, a federal auditor, that defendants knew to be performing its official duties relating to TRICARE, a program receiving in excess of $100,000 from the United States in each of the calendar years 2014 and 2015, by creating and causing to be created false and fraudulent prescription records and files for patients who had allegedly been seen and examined by Physician 1, and by producing and causing to be produced to ESI such false and fraudulent prescription records and patient files in response to ESI's audit, number 1477743094, commenced on behalf of the United States Department of Defense or about December 18, 2015, pursuant to Part 199 of Title 32, Code of Federal Regulations, concerning TRICARE claims that Irvine Wellness had submitted for reimbursement.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

34.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in any of Counts One through Twenty-One or Twenty-Four through Forty-Eight of this Indictment.

35.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

36.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in

value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

39.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Twenty-Two or Twenty-Three of this Indictment.

40.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

41.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

1  substantially diminished in value; or (e) has been commingled with

2  other property that cannot be divided without difficulty.

3

4                                                    A TRUE BILL

5

6                                                    _/S/_____

7                                                    Foreperson

8  NICOLA T. HANNA
   United States Attorney

9  *Brandon Fox*

10

11 BRANDON D. FOX
   Assistant United States Attorney
   Chief, Criminal Division

12

13 RANEE A. KATZENSTEIN
   Assistant United States Attorney
   Chief, Major Frauds Section

14

15 ALEXANDER F. PORTER
   Assistant United States Attorney
   Acting Deputy Chief, Major Frauds
16 Section

17 MARK AVEIS
   Assistant United States Attorney
18 Major Frauds Section

19

20

21

22

23

24

25

26

27

28